On September 19, 1996, the Hamilton County Grand Jury returned a three-count indictment charging defendant-appellant Lance R. Snedegar with involuntary manslaughter and felonious assault in connection with the September 1995 death of his eight-week-old daughter Chelsea and with felonious assault in connection with injuries sustained in August of 1996 by his three-week-old daughter Haley. The charges were tried jointly to a jury. The jury found Snedegar not guilty of involuntary manslaughter and felonious assault with respect to Chelsea, but guilty of felonious assault upon Haley. The trial court imposed the maximum allowable sentence and entered judgment accordingly.
From that judgment, Snedegar has taken the instant appeal, in which he advances seven assignments of error. Finding no merit to any aspect of the challenges therein presented, we affirm the judgment of the trial court.
The chain of events that led to Snedegar's indictment was set in motion by the August 10, 1996, telephone call placed by Snedegar's wife, Heidi, summoning emergency medical personnel to the couple's apartment to address her concerns over the pallor of their infant daughter, Haley. An examination by an emergency room physician after Haley's admission to the hospital revealed extensive bruising to the infant's torso, neck and face and fractures to twelve posterior ribs. The examining physician posited that Haley's injuries were the result of "abuse," based upon his supposition that the rib fractures were caused by an "extremely powerful squeeze" with the hands.
Detectives from the Norwood Police Department assigned to investigate the injuries questioned Snedegar and Heidi and also Heidi's mother, who served as Haley's caregiver while Heidi and Snedegar worked. All professed mystification as to the source of the injuries.
On September 16, 1996, however, Snedegar gave audio-taped and written statements to the police, in which he confessed to injuring Haley and, in the process, implicated himself in the September 1995 death of his daughter Chelsea. Snedegar stated that on the evening of August 10, 1996, when Haley awoke from a nap, he fed her and then lifted her from the car seat in which she lay to burp her. He admitted that, when he lifted the infant from her seat, with his fingers encircling her upper torso, he held her "a little tight so she wouldn't fall" and, in doing so, "put a little pressure" on her, but "not real hard." He then laid her across his shoulder to burp her. When he "tap[ped]" her on the back, Haley began to cry, suggesting to Snedegar, in retrospect, that he "might have hit her too hard than [he] was supposed to [sic]" and that Haley "knew her ribs were broke[n]." Snedegar returned Haley to her car seat. When Heidi, entered the room, Haley began to "whine" in a manner that, to Snedegar, signaled that she was still hungry. He then observed, however, that Haley had "turned pale." Fearful that he had caused Haley to "los[e] her breath or something," Snedegar left the apartment with the excuse that he needed to close the car. By the time Snedegar returned to the apartment, Heidi had run to the upstairs apartment occupied by her mother and summoned emergency medical assistance.
When Haley's internal injuries were discovered, Snedegar did not immediately confess his conduct, because he feared that he was, and that he would be held, responsible for the injuries, and because he dreaded the reactions of his wife and his mother-in-law. Snedegar also conceded that he had handled Haley as he had because he was "kind of angry" about her "whining." He asserted, however, that although he "fe[lt] like [he had done] something wrong, * * * [he had not] do[ne] it on purpose."
Snedegar, in his statement, then went on to confirm that the emotions and conduct that had preceded Haley's injuries had also preceded Chelsea's death. Snedegar stated that on September 9, 1995, after feeding Chelsea, he had lifted her to burp her in a manner similar to the manner in which he had lifted Haley. When Snedegar placed Chelsea on his shoulder, she cried, he became "upset," and he "put a little pressure on her." Chelsea then fell asleep. Snedegar confessed that, although he feared at the time that he had squeezed her too hard, he took no remedial action. He instead placed her in her bassinet on her side and went to take a bath. Five minutes later, Heidi rousted him from his bath with the news that she had found Chelsea face down in the bassinet and that the infant was pale and was not breathing.
Heidi's mother, spurred by an emotional and incomprehensible telephone call from her daughter, summoned emergency medical personnel, and they transported Chelsea to the hospital. Chelsea remained there on a life support system until September 15, 1995, when Snedegar and Heidi determined that the system should be removed, and Chelsea died.
Chelsea's autopsy disclosed no internal or external trauma, other than an inconsequential abrasion on her foot. The deputy coroner, having excluded any other cause, found that Chelsea's death was caused by "irreversible severe brain damage * * * brought about by interfer[ence] with the oxygen supply" by unknown means, and he concluded that these "autopsy findings * * * [were] consistent with status 6 days post near sudden infant death." Chelsea's death record thus reflected an "[u]ndetermined" manner of death and an "[u]ndetermined" cause of death, "consistent with" Sudden Infant Death Syndrome ("SIDS").
The SIDS diagnosis allayed Snedegar's fear that he had played some role in Chelsea's death. The diagnosis also preempted any police inquiry into the matter. However, on November 19, 1996, two months after Snedegar's indictment on the charges stemming from both Haley's injuries and Chelsea's death, the Hamilton County Coroner executed an affidavit, based upon Snedegar's September 16 statements to police, "correct[ing]" Chelsea's death record to reflect "[e]xternal chest compression" as the cause of death and "[h]omicide" as the manner of death.
 I.
In his first and second assignments of error, Snedegar contends that the trial court abused its discretion in declining to sever for trial counts one and two of the indictment, charging him with involuntary manslaughter and felonious assault in connection with Chelsea's death, from count three, charging him with felonious assault in connection with Haley's injuries. In his third assignment of error, Snedegar assails the court's exercise of its discretion in admitting into evidence, over objection, Snedegar's statement to police regarding Chelsea. Our disposition of the first and second assignments of error requires our resolution of the issue presented in the third assignment of error. We elect to address these challenges together, and in doing so, we find them untenable.
Snedegar filed, prior to trial, a motion for severance. Following a hearing, the trial court granted the motion. The state then filed notice of its intention to adduce at the separate trials evidence relevant to all counts of the indictment. The trial court sua sponte reconsidered its entry granting separate trials and ordered the counts "reconsolidated" for a single trial.
We reject at the outset Snedegar's contention that the trial court's sua sponte reversal of its initial decision to sever the counts for trial constituted a "per se abuse of discretion." The trial court's order granting separate trials on the charges was interlocutory in nature and was thus subject to amendment until the entry of final judgment in the case. See R.C. 2505.02 (which defines a "final order" in a manner to exclude an order granting separate trials on multiple charges); State v. Johnson (1991),77 Ohio App.3d 212, 219, 601 N.E.2d 555, 559 (recognizing that a trial court is not divested of its ability to amend its interlocutory orders until the entry of final judgment).
Turning to the merits of the challenge herein presented, we note that Crim.R. 8 permits charges to be joined in a single charging instrument if the charges are "the same or similar [in] character." However, the joinder of such charges for trial, because they are "the same or similar [in] character," poses a risk that the jury will, to the prejudice of the accused, draw from the evidence relevant to one charged offense the inference that the appellant has the propensity to commit such offenses and that he acted upon that propensity in committing another charged offense. Crim.R. 14 affords relief from the prejudicial joinder of charges in a single charging instrument by conferring upon the trial court the discretion to order separate trials.
To prevail on a challenge to the trial court's exercise of its discretion in denying separate trials on charges joined in the same indictment, the appellant must affirmatively demonstrate "(1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against [his] right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." State v. Schaim
(1992), 65 Ohio St.3d 51, 59, 600 N.E.2d 661, 668 (citing State v.Torres [1981], 66 Ohio St.2d 340, 421 N.E.2d 1288, syllabus). The appellant cannot be said to have been prejudiced by the joinder of multiple charges for trial if evidence relevant to the charges sought to be severed would be admissible at the trial of the remaining charges or if the evidence relevant to each charge is "simple and distinct." See Schaim, supra at 59, 600 N.E.2d at 669
(citing State v. Hamblin [1988], 37 Ohio St.3d 153, 158-159,524 N.E.2d 476, 481-482; Drew v. United States [C.A.D.C. 1964],331 F.2d 85).
Evid.R. 404(B) sets forth the common-law rule governing the admissibility of evidence of acts of wrongdoing unrelated to the offense for which the accused is being tried. The rule precludes the admission of "evidence of other * * * acts * * * to prove the character of a person in order to show that he acted in conformity therewith" and then supplies a nonexhaustive list of exceptions to the rule, providing that "evidence of other * * * acts * * * may * * * be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." R.C. 2945.59 similarly provides:
 In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.
 Evid.R. 404(B) and R.C. 2945.59 permit "other acts" evidence in a criminal proceeding if (1) substantial proof is adduced to show that the person against whom the evidence is offered committed the other act, (2) one of the matters enumerated in the rule or the statute is a material issue at trial, and (3) the evidence tends to prove the material enumerated matter. See State v. Lowe (1994), 69 Ohio St.3d 527, 530, 634 N.E.2d 616, 619; State v. Curry (1975), 43 Ohio St.2d 66, 330 N.E.2d 720, syllabus.
Snedegar was acquitted on counts one and two of the indictment. Therefore, a joint trial of the charges could only have been prejudicial as to count three.
With respect to count three, the defense offered at trial two alternative theories of defense and, in doing so, placed at issue the material matters of identity and intent. The defense raised the issue of Snedegar's identity as Haley's assailant, when, through cross-examination of prosecution witnesses and in argument, it sought to show that Snedegar's confession was the product of police coercion and that caregivers other than Snedegar, with access to Haley, had previously displayed a propensity for domestic violence. In the alternative, with reference to Snedegar's confession, the defense also offered the theory that Snedegar, if he did injure Haley, did not do so "knowingly." This theory of defense placed at issue the material matter of Snedegar's intent.
The jury's acquittal of Snedegar on the charges pertaining to Chelsea suggests that evidence of Snedegar's conduct with respect to Chelsea was insufficient in the eyes of the jurors to provide proof beyond a reasonable doubt of a causative link to the infant's death. Nevertheless, evidence of Snedegar's conduct toward Chelsea derived principally from Snedegar's uncontroverted statements to police and thus may fairly be characterized as substantial in nature.
In light of the similarities between Snedegar's conduct toward Chelsea and his conduct toward Haley, evidence of Snedegar's conduct toward Chelsea would tend to show that Snedegar, rather than one of Haley's other caregivers, had caused Haley's injuries. Moreover, in light of Snedegar's acknowledgement in his statement to police of the similarities between his conduct toward Chelsea and his conduct toward Haley, evidence of Snedegar's conduct toward Chelsea only one year earlier, with its tragic aftermath, would tend to show that Snedegar had acted with respect to Haley with an awareness of the potential consequences of his conduct. See R.C. 2901.22
(providing that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result * * *."). We, therefore, conclude that evidence relevant to counts one and two of the indictment, pertaining to Chelsea, would have been admissible at a separate trial on count three, pertaining to Haley.
A contrary conclusion, that the rules of evidence would have precluded the admission of evidence relevant to counts one and two in a trial on count three, would not mandate a contrary result. The evidence presented at trial as to each charge was simple and direct, and the jury demonstrated its ability to segregate the proof on each charge, when it found Snedegar guilty of the charge pertaining to Haley, yet acquitted him of the charges pertaining to Chelsea. See State v. Wiles (1991), 59 Ohio St.3d 71, 77,571 N.E.2d 97, 108; State v. Brooks (1989), 44 Ohio St.3d 185, 195,542 N.E.2d 636, 645 (holding that the trier of fact demonstrated its ability to segregate the proof as to each of multiple counts joined in an indictment, when it convicted him on one count, but acquitted him on counts pertaining to temporally separate offenses).
We, therefore, conclude that Snedegar was in no way prejudiced by the joinder of all charges for trial. Accordingly, we hold that the trial court's denial of Snedegar's motion for separate trials did not constitute an abuse of discretion, and on that basis, we overrule the first, second and third assignments of error.
 II.
The challenges presented in Snedegar's fourth assignment of error, to the denial of his Crim.R. 29 motion for acquittal, and in his fifth assignment of error, to the balance struck by the jury in weighing the evidence before it, are equally untenable. The trial court properly submitted to the jury the charge of felonious assault upon Haley, when, upon the evidence adduced at trial, reasonable minds could have reached different conclusions as to whether each material element of the offense had been proven beyond a reasonable doubt. See State v. Bridgeman (1978),55 Ohio St.2d 261, 381 N.E.2d 184. Moreover, the jury's verdict cannot be said to be contrary to the manifest weight of the evidence, because nothing in the record of the proceedings at trial suggests that the jury, in resolving the conflicts in the evidence, lost its way or created such a manifest miscarriage of justice as to warrant the reversal of Snedegar's conviction. See Tibbs v. Florida (1982), 457 U.S. 31, 102 S.Ct. 2211;State v. Martin (1983), 20 Ohio App.3d 172, 485 N.E.2d 717. We, therefore, overrule the fourth and fifth assignments of error.
 III.
Snedegar contends in his sixth assignment of error that the "undu[e] restricti[ons]" placed by the trial court on defense counsel in conducting voir dire denied him his right to a fair trial before an impartial jury. This contention is feckless.
The purpose of voir dire is to determine whether a prospective juror is statutorily qualified to serve as a juror and is free of bias or prejudice toward any party. See State v. Crago
(1994), 93 Ohio App.3d 621, 641, 639 N.E.2d 801, 814 (citingPavilonis v. Valentine [1929], 120 Ohio St. 154, 165 N.E. 730, paragraph one of the syllabus, and Crim.R. 24). The scope of the examination of prospective jurors is committed to the sound discretion of the trial court. Thus, any restrictions imposed by the trial court on the scope of voir dire will provide a basis for reversal only upon some demonstration that the court abused its discretion. See State v. Jenkins (1984), 15 Ohio St.3d 164, 186,473 N.E.2d 264, 286.
In the course of defense counsel's examination of prospective jurors in the proceedings below, the trial court sustained a number of the prosecution's objections. The record demonstrates that the court so "restrict[ed]" the scope of voir dire in an effort to encourage defense counsel to focus his inquiry by posing questions designed to probe the jurors' abilities to receive evidence, to apply the law, and to be fair and impartial. That being the purpose of voir dire, the court's imposition of such "restricti[ons]" cannot here be said to constitute an abuse of discretion. We, therefore, overrule the sixth assignment of error.
 IV.
In his seventh and final assignment of error, Snedegar challenges the trial court's imposition, upon his conviction of felonious assault, of the maximum statutory sentence. We find no merit to this challenge.
The offense of felonious assault as charged in the indictment was a second-degree felony, for which the maximum penalty was a definite term of incarceration of eight years. See R.C.2903.11(B); R.C. 2929.14(A)(2). The trial court sentenced Snedegar to eight years.
Snedegar had not previously been imprisoned. Under such circumstances, the Revised Code states a preference for the shortest prison term authorized by statute, "unless the [sentencing] court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B). A sentencing court may then impose the maximum authorized sentence, but only upon a finding that the offender has "committed the worst form of the offense, * * * pose[s] the greatest likelihood of committing future crimes," or satisfies the statutory definition of a "major drug offender" or a "repeat violent offender." See R.C.2929.14(C).
The imposition upon an offender of the maximum authorized sentence for a single offense imposes upon the sentencing court an obligation to "make a finding that gives its reason for selecting the sentence," R.C. 2929.19(B)(2)(d), and confers upon the offender a right to challenge the sentence on appeal. See R.C.2953.08(A)(1)(a). An appellate court "may increase, reduce, or otherwise modify" an appealable sentence or "vacate the sentence and remand the matter to the trial court for resentencing if the court clearly and convincingly finds * * * [t]hat the record does not support the sentence * * * [or t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(1)(a) and (d).
In the proceedings below, the trial court, upon consideration of the evidence adduced at trial, the report of the presentence investigation, and the matters disclosed at the sentencing hearing, prepared and placed of record its felony-sentencing findings. The court expressly found that its imposition upon Snedegar of the shortest prison term would "[d]emean the seriousness of the offense" and would "[n]ot adequately protect [the] public." The court further found that Snedegar had "committed the worst form of the offense" and that he "[p]oses the greatest likelihood of recidivism." See T.d. 121.
The record of the proceedings below demonstrates the trial court's compliance with the controlling sentencing provisions and discloses an evidentiary fundament for each of the trial court's findings. Thus, it will not permit a conclusion by this court that the imposition upon Snedegar of the maximum authorized sentence was either contrary to law or unsupported by the evidence. We, therefore, overrule the seventh assignment of error.
Having addressed all of Snedegar's assignments of error and found them wanting, we affirm the judgment of the trial court.
Sundermann, P.J., Winkler and Shannon, JJ.
Raymond E. Shannon, retired, from the First Appellate District, sitting by assignment.
Please Note:
The court has placed of record its own entry in this case on the date of the release of this Decision.